IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NAZJAH T. LLOYD**<br>1201 N. Colombo Ave, Apt. 16201<br>Sierra Vista, AZ 85635[1]<br><br>*Plaintiff,*<br><br>vs.<br><br>**THE CHIDLREN'S HOSPITAL<br>OF PHILADELPHIA d/b/a CHOP**<br>3401 Civic Center Blvd<br>Philadelphia, PA 19104<br><br>*Defendant.* | NO. 19-CV-02775-CDJ<br><br>CIVIL ACTION<br><br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED CIVIL ACTION COMPLAINT[2]

Plaintiff, by and through her undersigned counsel, hereby avers as follows:

### INTRODUCTION

1.  This action has been initiated by Nazjah T. Lloyd (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against The Children's Hospital of Philadelphia d/b/a CHOP (*hereinafter* referred to as "Defendant") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII - 42 U.S.C. §§ 2000d *et. seq*.) and the Pennsylvania Human Relations Act ("PHRA"). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Since the filing of her First Amended Civil Action Complaint, Plaintiff has moved, and therefore the instant caption has been amended to include her current, updated home address.

[2] Plaintiff files this Second Amended Civil Action Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2), consent of counsel pursuant to written stipulation.

## JURISDICTION AND VENUE

2. This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.

3. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this State and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny. This Court has supplemental jurisdiction over Plaintiff's future state-law claim(s) because such claim(s) arise out of the same common nucleus of operative facts as her federal claims asserted herein.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

5. Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing her Charge with the EEOC, and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.  Plaintiff has properly exhausted her administrative proceedings regarding her PHRA claims by dual-filing his Charge of Discrimination with the PHRC and by waiting at least one year since the filing before asserting her PHRA claims.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual, with an address as set forth in the caption.

8. Defendant Children's Hospital of Philadelphia (hereinafter "Defendant") is a non-profit entity that provides medical services in Philadelphia, Pennsylvania at the above-captioned address

9. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff is a female.

12. Plaintiff was employed as a Sterile Processing Technician in Defendant's Central Processing Department from in or about October 2017 until her unlawful constructive termination (as discussed *infra*) in or about November 2018.

13. Plaintiff was supervised by Second Shift Supervisor - Vecina Newsome ("Newsome"), and Center Processing Department Director - Robert Silverstein ("Silverstein").

14. Plaintiff was also permitted to address any workplace concerns with Defendant's Senior Human Resources Business Partner, John Kanzleiter ("Kanzleiter").

15. During the course of her employment with Defendant, Plaintiff was a hard-working employee who performed her job well.

3

16. However, Plaintiff's work environment while employed with Defendant became extremely hostile as a result of the discrimination and disparate treatment that she witnessed and was subjected to by Defendant's management based on gender. For example, but not intended to be an exhaustive list:

   a. Male employees were given preferential treatment with scheduling and often times had their scheduling needs and requests acknowledged and approved, unlike female employees within Plaintiff's department;

   b. Defendant's management failed to rotate the schedule fairly, resulting in male employees receiving preferential shifts and assignments;

   c. Male employees' time-punches were adjusted when they arrived late to work; however, Defendant's management failed to do the same for female employees, resulting in multiple write-ups for "lateness" against Plaintiff and other female employees;

   d. Defendant's management allowed male employees to take advantage of overtime hours, but did not provide female employees with the same opportunities;

   e. Defendant's management scheduled male employees with certain preferred lunch times but did not do the same for female employees;

   f. Male employees were assigned easier, more preferential work assignments that were not as physically demanding as compared to female employees within Plaintiff's department; and

   g. Defendant's management constantly belittled and humiliated Plaintiff as well as other female employees by reprimanding or correcting females in an open

area within the department (so could be heard by other employees) as opposed to in the privacy of management's office.

17. Based on the aforesaid discriminatory treatment that Plaintiff and other female employees were being subjected to, Plaintiff made multiple complaints to members of Defendant's management and Human Resources ("HR") department.

18. For example, on or about April 30, 2018, Plaintiff made a complaint to Newsome regarding preferential treatment of male employees; however, instead of properly addressing and/or investigating Plaintiff's concerns and objections to gender discrimination, Newsome became defensive and immediately threatened Plaintiff with a retaliatory write-up for "insubordination."

19. On or about May 1, 2018, Plaintiff attempted to escalate her concerns to Silverstein, but he was not in his office.

20. On or about May 2, 2018, Newsome again threatened to present Plaintiff with a retaliatory write-up, and in response, Plaintiff requested a union delegate be present as a witness.

21. On or about May 3, 2018, with a union delegate present, Plaintiff escalated her complaints of discrimination to Silverstein, who immediately treated Plaintiff with animosity and refused to listen to Plaintiff's concerns.

22. In the same meeting, Plaintiff requested Silverstein transfer Plaintiff to work under a supervisor other than Newsome, but Silverstein ignored Plaintiff's request. Instead, Silverstein reported to Plaintiff that Newsome had informed him of Plaintiff's complaints but that he did not believe Plaintiff and claimed she had "no proof" to support her complaints of gender discrimination.

23. On or about May 4, 2018, Silverstein emailed Plaintiff (with Newsome and Kanzleiter carbon copied) with a retaliatory write-up. Silverstein accused Plaintiff of "refusing" the write-up Newsome attempted to present Plaintiff with, which is entirely false, as Plaintiff did not refuse the write-up bust simply requested a union delegate's presence for the write-up meeting.

24. On or about May 9, 2018, Plaintiff again met with Silverstein in an attempt to reiterate and remedy her concerns regarding the aforesaid discriminatory animus being exhibited within her department towards female employees (including herself).[3] In response, Silverstein informed Plaintiff he was offended she had brought a union delegate into their previous meeting (as discussed *supra* at ¶¶21-22) as opposed to meeting with him alone, but again never assured Plaintiff that he would investigate or address her concerns of gender discrimination.

25. While Plaintiff did notice one minor difference in the rotation of the schedule following her meeting with Silverstein on May 9, 2018, this change only caused the aforesaid hostile work environment to worsen, thus becoming a discriminatory and retaliatory hostile work environment.

26. As a result of the change in the schedule rotation, male employees began complaining about their assignments (as they were no longer receiving the preferential shifts/schedule). In response to the male employees' complaints, Newsome informed them that the changed schedule was a result of "someone" complaining to Silverstein.

27. Upon information and belief, Newsome informed a male coworker, Leroy Fattah ("Fattah") specifically that Plaintiff was the person who complained about the gender related discrimination/disparate treatment as it related to the schedule rotation.

---

[3] In between her complaints and objections regarding gender discrimination to Silverstein, Plaintiff also expressed the same concerns to her union representative, Salima Pace on or about May 8, 2018.

28. Thereafter, multiple coworkers began treating Plaintiff poorly on account of her complaints. The poor treatment Plaintiff received included but was not limited to:

   a. coworkers no longer greeting Plaintiff;

   b. coworkers ignoring Plaintiff;

   c. coworkers ceasing conversations when Plaintiff entered a room (indicating that they were having a discussion about Plaintiff prior to her arrival);

   d. coworkers referring to Plaintiff as a "snitch;"

   e. coworkers refusing to answer Plaintiff's work-related questions; and

   f. coworkers submitting false reports against Plaintiff in an attempt to harm her employment.

29. On or about May 23, 2018, Plaintiff complained to Silverstein about Newsome sharing Plaintiff's complaints of gender discrimination with Plaintiff's coworkers and the resulting retaliatory hostile work environment (as described *supra* at ¶27)

30. Instead of meaningfully investigating Plaintiff's complaint, Silverstein called Plaintiff a liar, claiming she had no real proof or evidence that Newsome informed anyone of Plaintiff's gender discrimination complaints, and told Plaintiff to ignore her coworkers.

31. On May 31, 2018, Plaintiff filed a "Compliance Line Report" regarding a 'conflict of interest,' specifically pertaining to Newsome's act of sharing Plaintiff's confidential information and complaints with Plaintiff's coworkers, specifically Fattah.

32. Throughout the next few weeks, following her Compliance Line Report, Plaintiff attempted to ignore the continued hostility from Newsome and other employees, but the treatment became so bad that she yet again escalated her complaints to Kanzleiter through Defendant's "Compliance Line" on or about August 1, 2018.

7

33. In addition to the foregoing, Plaintiff also emailed Silverstein again (on or about August 1, 2018) requesting a transfer out of Newsome's department, stating: "[Newsome] has made it clear that I am not wanted on her shift and making me feel uncomfortable." In response, Silverstein informed Plaintiff there were "no open positions outside of second shift at this point in time."

34. On or about August 6, 2018, Kanzleiter met with Plaintiff in person to address her August 1, 2018 "Compliance Line Report." Plaintiff reiterated her complaints regarding the aforesaid disparate and discriminatory treatment of Plaintiff and other female employees based on gender and specifically informed Kanzleiter that Newsome gives Plaintiff and other female employees "write-ups" for lateness or time exhaustion, but will adjust male employees' time cards if they are late or exhaust time instead of issuing them a disciplinary action. Plaintiff also informed Kanzleiter of the retaliatory hostile work environment her coworkers were subjecting her to because of Newsome's disclosure of Plaintiff's complaints (discussed *supra*).

35. During her August 6, 2018 meeting with Kanzleiter, Plaintiff again requested a transfer so she would no longer have to work under such a discriminatory and hostile work environment.

36. Instead of investigating or promptly remedying Plaintiff's concerns and objections regarding gender discrimination within the workplace, Kanzleiter informed Plaintiff that *she* was making everyone feel uncomfortable in the department as a result of her complaints and objections. Kanzleiter further told Plaintiff to apply for positions she qualified for, and instructed Plaintiff to reach out to him directly instead of filing a "Compliance Line Report" if there were any issues in the future (thus deterring Plaintiff from making "official" reports of her concerns relating to gender discrimination and retaliation).

37. On or about August 14, 2018, Plaintiff had a meeting with Silverstein, Newsome, and Kanzleiter. A union delegate, Guy Booth, was also present. During this meeting, Plaintiff again reiterated her complaints of gender discrimination and retaliation; however, like in the past, Plaintiff's concerns were ignored and she was accused of lying about the aforesaid discrimination/retaliation.

38. Furthermore, during her August 14, 2018 meeting with Defendant's management and HR personnel, Kanzleiter directed Plaintiff *to cease documenting the discrimination and hostile work environment she was being subjected to*.

39. Despite Plaintiff's numerous complaints about and objections regarding gender discrimination and retaliation to Defendant's management, including Newsome, Silverstein, and Kanzleiter, the hostile work environment did not improve, and in fact only grew worse.

40. On or about September 6, 2018, Plaintiff took time off from work due to stress from the aforementioned discrimination and hostile work environment she was being subjected to, as her doctor recommended.

41. On or about September 27, 2018, after the hostile work environment had worsened and the discrimination had not ceased, Plaintiff escalated her complaints/objections even further to Joni Rittler, a Vice President at Defendant, by email, but received no response.

42. After applying to multiple roles within Defendant that Plaintiff qualified for, she emailed Kanzleiter on or about October 4, 2018 stating:

> Good morning John,
>
> I am reaching out to you [to] get an update on my transfer process. I would like to know where I am in the process. I have been applying for jobs that I qualify for both full time, and part-time yet all my applications have been denied. I understand that the process may take time, but unfortunately for me, the hostile work environment has become too toxic for me to do my job effectively.

43. On or about October 5, 2018, Kanzleiter informed Plaintiff that her disciplinary record/status of being on a Final Warning (a discipline status obtained *only* because of the retaliatory and discriminatory write-up(s) given to Plaintiff by Newsome/Silverstein) made her ineligible for transfer, but that she was still being allowed to apply for alternative roles and that if Plaintiff was identified as a candidate for any role, Kanzleiter would "speak with the hiring manager and determine if he/she was willing to consider [Plaintiff] for that role even with [her] current discipline."

44. However, upon information and belief and despite Kanzleiter's aforesaid assurance (as discussed *supra* in ¶43), Defendant never identified Plaintiff as a candidate for any position, despite having the necessary qualifications to perform the roles for which she applied. As a result, Plaintiff was not transferred out of Newsome's supervision, allowing the discriminatory/retaliatory hostile work environment to continue.

45. On or about November 1, 2018, Plaintiff returned to work from her medical leave of absence (due to stress from the discrimination and hostile work environment she had been subjected to).

46. Upon her return to Defendant, the discriminatory and retaliatory treatment of Plaintiff continued, and she continued to be subjected to pervasive and intolerable conditions.

47. As a result of the aforesaid constant and insufferable harassment that Plaintiff had been subjected to during her employment with Defendant based on her gender and/or expressed concerns of gender discrimination and due to Defendant's clear refusal to remedy or even investigate her concerns, Plaintiff was left with no other choice but to resign from her employment with Defendant on November 5, 2018 – resulting in her constructive discharge from Defendant.

**Count I**
**Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**([1] Gender Discrimination [2] Hostile Work Environment & [3] Retaliation)**

48. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

49. While employed by Defendant, Plaintiff witnessed and was personally subject to a hostile work environment because of her gender through disparate and demeaning treatment, as well as discriminatory harassment.

50. The aforementioned harassment that Plaintiff was subjected to as a female employee of Defendant was severe and pervasive and interfered with her ability to perform her job tasks.

51. Plaintiff complained of and objected to the aforesaid gender-related discriminatory and disparate treatment multiple times to members of Defendant's management and HR in advance of her termination, and asked for the same to cease; however, her concerns were never investigated or remedied and the discriminatory harassment only grew worse.

52. In fact, the harassment following her complaints about and/or objections to gender discrimination escalated to the point that Plaintiff was forced to complain to Defendant's management and HR personnel about the unlawful retaliation she was being subjected to (in addition to the aforesaid gender discrimination).

53. For example, Plaintiff was subjected to the following in retaliation for her protected activities: (1) a retaliatory hostile work environment; and (2) retaliatory discipline.

54. The aforementioned harassment, discriminatory treatment, and retaliation was so pervasive and intolerable such that no reasonable person of the same gender and position as Plaintiff could have been expected to remain in such conditions.

55.     As a result of the aforesaid intolerable discriminatory and retaliatory treatment that she was subjected to on account of her gender and/or objections to said discrimination, as well as Defendant's clear refusal to remedy or even investigate her concerns, Plaintiff was forced to resign from her position and therefore was constructively terminated from her employment with Defendant on November 5, 2018.

56.     These actions constitute a discrimination and retaliatory hostile work environment and an unlawful constructive discharge under Title VII.

## COUNT II
## Violations of the Pennsylvania Human Relations Act ("PHRA")
([1] Gender Discrimination [2] Hostile Work Environment & [3] Retaliation)

57.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

58.     Plaintiff properly exhausted her administrative remedies regarding her PHRA claims because she timely filed a charge of discrimination with the PHRC and the charge has been pending for at least one year.

59.     The aforesaid Title VII allegations also constitute violations of the PHRA. Thus, Plaintiff's PHRA claims mirror the claims as set forth in her previous Title VII claims.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.      Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date she first suffered retaliation at the hands of Defendant until the date of verdict;

B.      Plaintiff is to be awarded punitive damages, as permitted by applicable law(s) alleged asserted herein, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C.      Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

D.      Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

E.      Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

F.      Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

          Respectfully submitted,

          **KARPF, KARPF, & CERUTTI, P.C.**

By:   */s/ Allison A. Barker*
       Ari R. Karpf, Esq.
       Allison A. Barker, Esq.
       3331 Street Road
       Two Greenwood Square, Suite 128
       Bensalem, PA 19020

Date: October 28, 2020